## LEWIS MEARS CO. v. CHICAGO MERCAN-TILE EXCH. et al.

(Circuit Court of Appeals, Seventh Circuit.
August 16, 1924.)

No. 3389.

1. Contracts ⬤284(4) — Arbitration must stand, unless erroneously or fraudulently reached.

Arbitration, pursuant to provision of contract providing therefor in case of breach, must stand, unless erroneously or fraudulently reached.

2. Exchanges ⬤14—Evidence held to sustain determination of exchange's clearing house committee as to actual value of undelivered eggs.

In action against mercantile exchange by corporation, which sold eggs "short" on the exchange, and was unable to deliver, evidence *held* to sustain determination of clearing house committee as to "actual value" of the eggs under rules of the exchange, giving committee right to decide actual value.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Action by the Lewis Mears Company against the Chicago Mercantile Exchange and others. Judgment for defendants, and plaintiff appeals. Affirmed.

Walter D. Herrick, of Chicago, Ill., for appellant.

Henry S. Robbins, of Chicago, Ill., for appellees.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Plaintiff, a Massachusetts corporation, sold "short" on the exchange for January, 1921, delivery, 20 cars of "refrigerator standards" and 29 cars of "fresh gathered firsts" eggs, which it was unable to deliver. The "margins" in excess of a fair price, which under the rules of the exchange it was required to deposit, aggregated some $50,000, which sum it seeks by this action to recover from the "Chicago Mercantile Exchange," an Illinois corporation, herein called defendant. No relief, save discovery, was sought against the other defendants. The contract was made through Bowman & Co., brokers, members in good standing of defendant, and was an Illinois contract. Operations on defendant's exchange were either "spot calls" (sometimes called cash tradings) or "future calls." The latter related to future deliveries, while the "spot calls" pertained to sales for immediate delivery or delivery within 10 days.

The present controversy relates to "future calls" only, or, to be more specific, to January, 1921, deliveries, which contracts permitted plaintiff to deliver the eggs at any time in January. "Refrigerator standards" was a local trade term, and meant eggs gathered in May or June of the preceding year, and of certain grade. "Fresh gathered firsts" was also a trade term, and signified a grade of eggs or degree of freshness well known to the trade. Such eggs had to be packed in "new whitewood cases" and be "on track" in a refrigerator car with an inspection certificate not more than two days old. These terms and the rules of the exchange were well known to all parties to this action.

When eggs of the kind mentioned are all controlled by certain dealers, and sellers are unable to purchase a sufficient amount to meet their contract, a "corner" is created, and the unfortunate seller is "squeezed," so we are informed by the witnesses who testified on this trial. Unable to meet its contract, a dealer so squeezed is required to settle according to rules 47 and 48, which read:

(47) "Where a member defaults on delivery of either butter or eggs at the specified time of delivery the executive secretary or manager of the clearing house shall go into the open market and buy the commodity in default; when the seller shall be liable for the difference between the price at which the commodity was purchased and the price at which it was sold, and in addition, a penalty of one cent per pound or one cent per dozen, the penalty to be paid to the clearing house."

(48) "In case the clearing house on the final day of settlement is unable to purchase in the open market the commodity short in the quantity desired, then the clearing house committee shall decide upon the actual value of the commodity of that day, which amount the member in default shall pay to the clearing house, in addition to the usual penalty demanded, and in' that case the clearing house shall turn over to the buyer or aggrieved party both the difference between the actual value of the commodity so established and the settling price, and also the penalty charged."

In the present case, plaintiff, it appears, did not attempt to fill its contract during the fore part of January, and later, when a strenuous effort was made, it found the market "cornered" and itself in a tight "squeeze." Under the rules of the exchange, settlements are made daily. To illustrate: If the price goes up during the day, sellers who have sold for future deliveries, pay to the exchange a sum that represents the rise, and the exchange pays this sum to the pur-

chaser. If a default occurs, the exchange liquidates the contract; that is, it buys the amount still due under the contract, and charges the seller who has sold short the difference between the selling and buying price, and the "deal" is "closed."

On January 29th, F. G. F. eggs sold at 65¼, and R. S. eggs, on January 24th, the last transaction, were at 63 cents, per dozen. Settlements were made by plaintiff through Bowman & Co. on this basis, and defendant paid the sum thus received to the sellers. On January 31st, no eggs being obtainable, plaintiff defaulted in its deliveries, and the manager of the exchange went into the market and bought 1 car of F. G. F. at 60 cents per dozen, and then bid up to 65¼ cents, the settlement price of the day before, but secured only 6 cars at this price. He also bid 63½ cents for R. S., but purchased only 1 car. Plaintiff was still short 25 cars (16 on F. G. F. and 9 on R. S.), and through his broker asked and secured a hearing by the clearing house committee which was continued the next day. This committee, following, or attempting to follow, rule 48, fixed 63½ cents per dozen for R. S., and 65¼ cents for F. G. F., as "the actual value of the eggs of that day."

Plaintiff contends that the committee erred in determining the "actual value" of the eggs, and that in acting as it did a fraud was committed upon it, which the court by this action is to rectify through the rendition of a judgment for the difference between the "actual value of the eggs" as found and the sum the committee should have fixed on the evidence before it as the "actual value." While the foregoing facts might suggest nothing but a gamble and the "cornering" of the market and the resulting "squeeze," hardly characteristic of conscionable business transactions, the isolated transaction is but one of a large number constantly made on boards of trade, stock exchanges, and like organizations, the validity of which have been frequently upheld. Board of Trade v. Christie, 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031; United States v. N. Y. Sugar Exchange, 263 U. S. 611, 44 Sup. Ct. 225, 68 L. Ed. 475.

Plaintiff does not complain thereof, nor of the rules governing the "dealing," nor of their reasonableness, nor of their binding effect on parties who deal on or through the exchange. But it contends, and the evidence shows, that fresh eggs of the grade (but not similarly packed and inspected as required by the rules) were purchasable at 52 or 53 cents a dozen; and, further, it argues that a finding of 63½ cents a dozen for refrigerator eggs cannot be sustained in the face of testimony showing fresh eggs were obtainable at a price 12 cents a dozen less. But what of plaintiff's contract? When it concedes the validity of its contract and that the method of settlement is valid, there is left in the case nothing but a simple contract, calling for the purchase and sale of a specified commodity, and containing a further provision for arbitration in case of a breach thereof, followed by an actual voluntary submission to arbitration and an award, the only objection to which is its excessiveness.

[1] Such an arbitration must stand unless it was erroneously or fraudulently reached. The evidence not only shows Bowman & Co. agreed to the method of settlement, but actually asked for it, and appeared and presented plaintiff's case. More than this, plaintiff wired its brokers to "take chances on nondelivery and see what clearing house committee does with regard to fixing fair value settling basis per rule 48."

[2] Examining the evidence, we find that the clearing house committee gave all parties a full hearing—heard the evidence on the egg market "on the exchange" and in "the open market." From this evidence it appears that Bowman & Co. had "combed" the Northwest for eggs, and had vainly sought for days to purchase eggs to meet the contract. On January 29th the market was open, and the price that day was as high as the sum fixed. While the manager on January 31st was required to purchase the eggs to fill the contract, he refused to bid higher than the price at which they sold on the 29th. He would have been compelled to go higher, and doubtless much higher, to get the required 25 cars. The committee, notwithstanding this evidence, fixed the value at the price these eggs sold on January 29th and January 31st.

Upon this record the language of the Supreme Court in Burchell v. Marsh, 17 How. 349, 15 L. Ed. 96, seems particularly appropriate: "Arbitrators are judges chosen by the parties to decide the matters submitted to them, finally and without appeal. As a mode of settling disputes, it should receive every encouragement from courts of equity. If the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error, either in law or fact. A contrary course would be a substitution of the judgment of the chancellor in place of the judg-

es chosen by the parties, and would make an award the commencement, not the end, of litigation. * * * Courts should be careful to avoid a wrong use of the word 'mistake,' and, by making it synonymous with mere error of judgment, assume to themselves an arbitrary power over awards. The same result would follow if the court should treat the arbitrators as guilty of corrupt partiality, merely because their award is not such an one as the chancellor would have given. We are all too prone, perhaps, to impute either weakness of intellect or corrupt motives to those who differ with us in opinion. * * * We can see nothing in the admitted facts of the case from which any such inference can be justly made. * * * It may be admitted, that on the facts appearing on the face of the record, this court would not have assessed damages to so large an amount, nor have divided them so arbitrarily between the parties; but we cannot say that the estimate of the arbitrators is so outrageous as of itself to constitute conclusive evidence of fraud or corruption. Damages for injuries of this sort cannot be measured by any rules, nor can the court properly impute corruption to others, because they differ with them in their estimation of a matter which depends on discretion rather than calculation. It is enough that the parties have agreed to trust the discretion and judgment of neighbors acquainted with them, and their relative standing and credit. * * * If they have given their honest, incorrupt judgment on the subject-matters submitted to them, after a full and fair hearing of the parties, they are bound by it; and a court of chancery have no right to annul their award because it thinks it could have made a better."

The judgment is affirmed.